**FOR PUBLICATION**

[26]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ : | |
| DIANA ARCAND and THOMAS : | |
| SHOOSMITH, : | |
| on Behalf of Themselves and All Others : | |
| Similarly Situated, : | |
| : | Civil Action No. 3:07-cv-4987 (FLW) |
| : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | **OPINION** |
| BROTHER INTERNATIONAL : | |
| CORPORATION, : | |
| : | |
| Defendant. : | |
| _____: | |

**WOLFSON, United States District Judge:**

Presently before the Court are two motions filed by Defendant Brother

International Corporation ("BIC"): (1) a motion to dismiss all claims pursuant to Fed. R.

Civ. P. 12(b)(6), and (2) a motion to strike nationwide class allegations pursuant to Fed. R.

Civ. P. 12(f).  In their First Amended Complaint ("Complaint"), Plaintiffs Diana Arcand

("Arcand") and Thomas Shoosmith ("Shoosmith"), individually, and on behalf of a putative

class of consumers (collectively "Plaintiffs"), who purchased Brother-brand laser printers

and toner cartridges, assert claims against BIC for: (1) fraudulent concealment; (2)

violations of the New Jersey Consumer Fraud Act ("NJCFA"); (3) trespass to chattels; and

(4) conversion.  Plaintiffs claim that they were injured by BIC each time they had to

prematurely buy new toner cartridges for their laser printers when the printers falsely indicated the toner cartridge needed to be replaced notwithstanding the fact that usable toner remained in the cartridge.  For the reasons that follow, the Court finds that Plaintiffs' NJCFA claim must be dismissed because Plaintiffs fail to allege that they suffered an ascertainable loss due to BIC's unlawful conduct.  The Court also dismisses Plaintiffs' fraudulent concealment claim.  These claims are dismissed without prejudice, with a right to re-plead. Additionally, the Court dismisses with prejudice Plaintiffs' trespass to chattels and conversion claims.

## I.  Statement of Facts and Procedural History

The following version of events assumes Plaintiffs' allegations in the Complaint to be true because BIC moves pursuant to <u>Fed. Civ. R. P.</u> 12(b)(6) and (f).  Defendant BIC, a Delaware corporation headquartered in Bridgewater, New Jersey, is a subsidiary of Brother Industries LTD ("BIL") and the authorized distributer and provider of customer support for Brother-brand laser printers and toner cartridges sold within the United States.  Compl. ¶ 6.  Arcand, a Virginia resident, purchased a Brother HL-2040 laser printer and replacement Brother toner cartridges in Virginia.  <u>Id.</u> ¶ 4.  Shoosmith, a New Jersey resident, purchased a Brother HL-2070 laser printer and replacement Brother toner cartridges in New Jersey.  <u>Id.</u> ¶ 5. Both printers, as indicated in the user manual, denote a maximum page yield: "replacement toner cartridges print up to 2,500 A4 or Letter-size single-sided pages at 5% coverage."  Supplemental Certification of Michael R. McDonald, ("Supp. McDonald Certif."), Ex. E, User Manual p.5-2.[1]

---

[1]     As discussed more fully <u>infra</u>, the Court has considered relevant portions of BIC's user manual and service manual in the instant Motion to Dismiss because the Court finds that they are explicitly relied upon in the Complaint.

Brother-brand printers notify the user when the toner reaches a certain level. Compl. ¶ 17.  In this case, both Arcand's and Shoosmith's laser printers display a yellow LED light and a "Toner Life End" message when the toner reaches this level.  Id. ¶¶ 17-18. According to the service manuals for the models owned by Arcand and Shoosmith,[2] the toner cartridge is considered to be at life end when approximately forty-four grams of toner are remaining in the cartridge. Id. ¶ 36.  A new cartridge contains approximately 100 grams of toner.  Id.  Notwithstanding the fact that some toner remains in the cartridge, the user manual explains that this light and message indicate that the printer has run out of toner. Id. ¶ 17.  The user manual also "strongly recommend[s]" that users not refill toner cartridges or purchase any toner cartridges other than "Genuine Brother Brand."  Id. ¶ 15. The  LED light and message indicating the end of toner life not only act as a warning but preclude the user from printing until the "empty" toner cartridge is replaced.  Id. ¶¶ 26, 32. According to Arcand and Shoosmith, they were unaware when they purchased the printer of this "forced shut-down mechanism," which causes the LED light to illuminate and to display an empty message when there is what Plaintiffs consider to be "a large amount of usable toner" remaining, thereby preventing them from using all the toner in the cartridges.  Id. ¶¶ 2, 28, 34.

**B.    Procedural History**

Plaintiffs initiated this putative class action on October 17, 2007.  A motion to dismiss, or in the alternative, to stay the proceeding pending resolution of a similar action

---

[2]As indicated by the Plaintiffs, the service manual is not readily available to consumers, but is only provided through authorized service centers.  Compl. ¶ 35.   The Court assumes that Plaintiffs secured a copy of the service manual before filing their Complaint given the references included therein.

in California, was filed by BIC on January 4, 2008, and was subsequently denied by this

Court on August 27, 2008.  BIC again filed a motion to stay the proceedings, this time due

to another action in California that was pending class certification, on September 19, 2008.

On January 30, 2009, this Court again denied BIC's motion to stay the proceedings.  On

February 9, 2009, BIC filed a motion to dismiss Plaintiffs' Complaint and strike nationwide

class allegations.  This Court later terminated the motion, however, because Plaintiffs filed

their first amended complaint on February 27, 2009.  In response, BIC filed a motion to

dismiss Plaintiffs' amended complaint and strike nationwide class allegations on March 16,

2009.  After a recent decision in this District, in a case factually analogous to the one at

bar,  Knox v. Samsung Electronics America, Inc., No. 08-cv-4308 (D.N.J. July 2009), the

Court provided both parties the opportunity to submit a  sur-reply brief in support of their

respective positions.

II.    Discussion

    A.    Standard of Review

    When reviewing a motion to dismiss on the pleadings, courts "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)

(citation and quotations omitted).  In Bell Atlantic Corporation v. Twombly, 550 U.S. 544,

127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard.

Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41,

45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." Id. at 1968 (quoting Conley, 355 U.S. at 45-46).  Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965.  As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating … a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 127 S.Ct. at 1965).

In affirming that Twombly standards apply to all motions to dismiss, the Supreme Court recently explained the principles.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950.  Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the  assumption of truth." Id.  Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." Fowler, 578 F.3d at 211.

Before reaching the merits of Plaintiffs' claims, there is a threshold procedural question as to what, if any, documents and exhibits may be considered on this Motion pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs supply this Court with several exhibits, including (1) a response by BIC to an Order to Show Cause in the matter

of <u>Kandel v. Brother International Corporation</u>, No. 08-1040 ("<u>Kandel</u>"), a case currently

pending in the Central District of California (Kaplan Decl. ¶ 2; Ex. A); (2)  a letter from

BIC's counsel to the plaintiff's counsel in <u>Kandel</u> titled <u>Responding to Consumer Legal</u>

<u>Remedies Act Demand Letter</u> (Kaplan Decl. ¶ 3; Ex. B);  (3) selected pages from the service

manual for Brother-brand printers model numbers HL-2030/2040/2070N  (Kaplan Decl. ¶

4; Ex. C);  (4) a survey of user manuals, compiled by Plaintiffs' counsel, listing printer

model numbers, control panel messages and explanations purportedly found in the user

guides (Kaplan Decl. ¶ 5; Ex. D); (5) selected excerpts from the user manual for Arcand's

printer (model HL-2040) and Shoosmith's printer (model HL-2070) (Kaplan Decl. ¶ 6; Ex.

E); and (5) an article from an online web magazine detailing one user's frustration with the

shutdown mechanism equipped on Brother-branded printers (Kaplan Decl. ¶ 7; Ex. F); .

      BIC objects to Plaintiffs' introduction of the foregoing materials in this Motion to

Dismiss, yet likewise attaches several documents as exhibits to its Motion, including: (1)

an Opinion by the Central District of California in the <u>Kandel</u> matter (McDonald Decl. ¶ 3;

Ex. B); (2) class action complaints in <u>Lipper v. Brother International Corporation</u>, No.

CV08-06126 ("<u>Lipper</u>"), a case currently pending in the Central District of California, and

the <u>Kandel</u> matter (McDonald Decl. ¶¶ 4-5; Ex. C, Ex. D); (3) selected excerpts from the

user manual for Arcand's printer (model HL-2040) and Shoosmith's printer (model HL-

2070) (McDonald Supplemental Decl. ¶ 3; Ex. E); and (4) deposition testimony taken in the

case of <u>Maniscalco v. Brother International Corporation</u>, No. 06-04907 ("<u>Maniscalco</u>"), a

case pending before this Court (McDonald Decl. ¶4; Ex. F).  While Plaintiffs do not likewise

dispute the inclusion of Defendant's exhibits in consideration of this Motion to Dismiss, the

Court will nevertheless consider which of the proposed exhibits may be properly

considered.

Generally, when ruling on a motion to dismiss, a court may not consider matters outside the pleadings.  However, a court may consider documents that are "integral to or explicitly relied upon in the complaint" without converting a motion to dismiss into a motion for summary judgment.  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir.1999) (emphasis and citations omitted).   Indeed, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). Consideration of these referenced documents will not require the conversion of a motion to dismiss to one for summary judgment under Fed. R. Civ. P. 12(b)(6).  "When a complaint relies on a document . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." Id. at 1196-97.  Even if a "[c]omplaint does not explicitly refer to or cite [a document] ... the critical [issue] is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original) (citations omitted).

Additionally, public documents and prior judicial proceedings may be considered in deciding a motion to dismiss.  See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd., 181 F.3d 410, 426 (3d Cir. 1999); Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 342 (3d Cir. 2004). see also Herring v. United States, No. 03-5500, 2004 WL

2040272, at *7 (E.D.Pa. Sept.10, 2004), aff'd, 424 F.3d 384 (3d Cir. 2005).  Indeed, on a

motion to dismiss:

> a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint. . . . Specifically, on a motion to dismiss, we may take judicial notice of another court's opinion-not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.

Southern Cross Overseas Agencies, 181 F.3d at 426-27 (citations omitted).

Under the foregoing legal standard, it is clear that this Court may consider the

attached excerpts from the BIC user manual (McDonald Supplemental Decl. ¶ 3; Ex. E;

Kaplan Decl. ¶ 6; Ex. E) and the BIC service manual (Kaplan Decl. ¶ 4; Ex. C).  Indeed, not

only do Plaintiffs expressly reference both the user and service manuals in the Complaint

by directly quoting selected language in support of their claims, the language and

information quoted from both manuals concern the "Toner Life End" Message and precise

weight measurements of the toner cartridges after the toner has reached its life end, which

in conjunction with the printer shutdown mechanism, are at the crux of Plaintiffs' claims.

See Compl. ¶¶ 15, 35, 36.   Thus, the Court finds that it may consider the user and service

manuals as undisputed documents[3] referenced in the Complaint or central to Plaintiffs'

claims, without converting this motion to one for summary judgment.

Although the Court may also consider the Kandel Opinion (McDonald Decl. ¶3; Ex.

B), and the Kandel and Lipper class action complaints (McDonald Decl. ¶¶ 4-5; Ex. C, Ex.

D), their use is strictly limited to the existence of the opinion and the pleadings in those

matters.  As previously noted, "[w]hile a prior judicial opinion constitutes a public record of

---

[3]        The Court finds absolutely no basis for BIC's vague objection based upon Fed. R. Evid. 901, to the authenticity of the proffered excerpts from the manuals.

which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion." See Lum v. Bank of America, 361 F.3d 217, 222 n. 3 (3d Cir. 2004).  The same holds true for pleadings.  See Southern Cross Overseas Agencies, 181 F.3d at 426-27.

The remaining submissions are neither referenced in the Complaint nor essential to Plaintiffs' claims, and will not be considered in this Motion.  Although Plaintiffs cite the brief filed by BIC in response to the Order to Show Cause in the Kandel matter (Kaplan Decl. ¶ 2; Ex. A) and the letter from BIC's counsel in the Kandel matter (Kaplan Decl. ¶ 3; Ex. B) as being BIC's admissions as to its corporate operations in New Jersey, facts probative in the choice of law analysis, the Court finds that they are neither referenced in the Complaint, nor essential to Plaintiffs' allegations such that their consideration is proper in the context of the instant Motion to Dismiss.  While the Court agrees that the facts contained in the proffered documents may indeed be essential to the Court's choice of law analysis, they are not integral to the Complaint such that their admission is appropriate at this stage in the litigation.  Indeed, the choice of law analysis is very fact intensive and should not be undertaken where a full factual record is required.  See Harper v. L.G. Electronics, 595 F.Supp.2d 486, 490-91 (D.N.J. 2009)(declining to make choice-of-law determination on motion to dismiss where factual record was insufficient).   The Plaintiffs' submission of the online magazine article (Kaplan Decl. ¶ 7; Ex. F), the survey of user manuals compiled by Plaintiffs' counsel (Kaplan Decl. ¶ 5; Ex. D) and the deposition testimony taken in Maniscalco case  (McDonald Decl. ¶4; Ex. F) suffer from the same infirmity.  While the information contained therein may indeed be essential to the choice of law analysis, those exhibits are not integral to Plaintiffs' claims such that their admission

is proper on a Motion to Dismiss.  The narrow exception to the general rule that a motion

to dismiss must be decided based solely on the allegations of a well-pleaded complaint

ceases to have any limits if any tangentially related documents may be considered.

### B.      New Jersey Consumer Fraud Act (NJCFA) Claims

#### 1.      Choice of Law

It is axiomatic that a district court must apply the choice of law rules of the forum

in which the court sits.  See Klaxon v. Stentor Elec. Mfg., Inc., 313 U.S. 487, 496 (1941);

Thabault v. Chait, 541 F.3d 512, 535 (3d Cir. 2008).  Hence, the Court will apply New

Jersey's recently adopted choice of law analysis, the most significant relationship test.  P.V.

v. Camp Jaycee, 197 N.J. 132, 142-43 (2008); Nafar v. Hollywood Tanning Sys., No. 08-

3994, 2009 WL 2386666, at *4 (3d Cir. Aug. 5, 2009);  see also Ghaffari v. Hern, No. 06-931

(FLW), 2009 WL 2147092, at *3 (D.N.J. Jul. 15, 2009).

The most significant relationship test is a case-by-case, qualitative analysis

consisting of two prongs.  See P.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008).  The first

prong of the analysis requires a court to examine the substance of the potentially

applicable laws in order to determine if an actual conflict exists.  Id. at 143-44 (citing

Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006)).  Where there is no actual conflict,

the analysis ends and the court applies the law of the forum state.  Schwartz v. Hilton

Hotels Corp., 639 F. Supp. 2d 467, 471 (D.N.J. 2009).  If a conflict does exist, the court

must turn to the second prong, which requires the court to weigh the factors enumerated in

the Restatement sections corresponding to a plaintiff's cause of action.  See Camp Jaycee,

197 N.J at 143-45.

A conflict arises when there exists a "distinction" between the substance of the

potentially applicable laws. <u>Camp Jaycee</u>, 197 N.J. at 143. Here, the parties agree that there is a conflict of laws with regard to Arcand's consumer fraud claim given that she is a Virginia resident.[4] The parties do not dispute that the outcome of the consumer fraud claims would differ in Virginia versus New Jersey. Under the Virginia Consumer Protection Act ("VCPA"), Arcand could neither assert class action claims, <u>see</u> <u>Am. Online v. Super. Ct.</u>, 90 Cal. App. 4th 1, 17 (2001) (citing <u>King v. Va. Birth-Related Neurological Injury Comp. Program</u>, 22 Va. Cir. 156 (1990), nor could she obtain injunctive relief, <u>Physicians Comm. for Responsible Med. v. General Mills, Inc.</u>, 283 Fed. App'x 139, 141-44 (4th Cir. 2008), and BIC would be subject to a minimum statutory penalty of $500. <u>Va. Code Ann.</u> § 59.1-204. Conversely, the NJCFA encourages private class actions, <u>Fink v. Ricoh</u>, 365 N.J. Super 520, 570 (Law Div. 2003), permits private injunctive relief, <u>Weinberg v.Sprint Corp.</u>, 173 N.J. 233, 253 (2002), and has no minimum statutory penalty, N.J.S.A. § 56:8-2.11. Therefore, if Virginia, as opposed to New Jersey, law were applied in this case, a class action headed by Arcand would be barred, Arcand would be precluded from seeking injunctive relief, and the statutory penalty imposed on BIC would differ. Since both parties assert differences in the laws that assuredly affect the outcome of this case, the Court finds that an actual conflict does exist.

Once an actual conflict is established, the most significant relationship test requires the Court to weigh the factors enumerated in the Restatement section corresponding to the Plaintiffs' cause of action. <u>See</u>, <u>Camp Jaycee</u>, 197 N.J. at 143-44. The factors of the applicable Restatement section must then be examined in light of the contacts and principles set forth in Restatement Section 6. <u>Camp Jaycee</u>, 197 N.J. at 144-45. The

---

[4]    No conflict arises with regard to Shoosmith's claim. As a New Jersey resident, the NJCFA clearly applies to his claim.

starting point of the Court's Restatement analysis in this case is Section 148, which governs the choice of law analysis for consumer fraud claims.  See Agostino v. Quest Diagnostics Inc., 256 F.R.D. 437, 462 (D.N.J. 2009);  In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 64 (D.N.J. 2009).  Section 148 of the Restatement (Second) provides:

> (1)     When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

> (2)     When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

>> (a)     the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

>> (b)     the place where the plaintiff received the representations,

>> ©     the place where the defendant made the representations,

>> (d)     the domicil, residence, nationality, place of incorporation and place of business of the parties,

>> (e)     the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

>> (f)     the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (1971).

Whether subsection (1) or subsection (2) of Section 148 is applicable thus depends upon where the alleged false representations were made and received.  Plaintiffs' Complaint alleges that BIC officials concealed the fact that toner remained in the cartridge when the shutdown mechanism initiated and that they did so with the intent to fraudulently induce purchases of replacement cartridges.  Compl. ¶ 62.  In opposition to the instant Motion to Dismiss, and in support of Plaintiffs' contention that New Jersey Law applies under New Jersey's most significant relationship test, Plaintiffs assert that the false representations giving rise to Arcand's NJCFA claims were made by BIC officials in New Jersey.  Defendant, on the other hand, urges this Court to find that there was no conduct by BIC officials in New Jersey that could possibly support a finding that any false representations were made in New Jersey with respect to Arcand.  The Complaint can be construed as asserting two sets of allegations, (I)  those that concern the representations (or lack thereof) made at the time of purchase of the printer; and (ii) those made in conjunction with the purchase of toner cartridges, i.e. the alleged misrepresentation of "empty" on the printer.  Id.

BIC argues that there are no facts to support Arcand's contention that the allegedly false messages emanated from New Jersey.  BIC contends that while it is headquartered in New Jersey, the printers were designed and manufactured in Japan.  Def's Ex. E, B-5.  Moreover, BIC points to the fact that Arcand's printer, which allegedly displayed the false "Toner Life End" Message, did so in Virginia, and not New Jersey.   To the extent that Arcand alleges the user manual contains false messages or purposefully omitted

13

disclosures, BIC contends that final composition of the user manual was governed by BIL officials in Japan.  Def's Ex. E, B-5.  In response, Plaintiffs cite to a number of official corporate actions taken in New Jersey, which they claim supports a finding that false representation were indeed made by BIC officials in New Jersey.  As previously discussed, however, much of the factual record to which both Plaintiffs and Defendant cite in support of their respective positions, will not be considered by this Court on the Motion to Dismiss.

This Court need not, and will not, resolve this choice of law issue at this early stage of the litigation.  The second prong of New Jersey's most significant relationship test requires the Court to engage in a fact sensitive analysis, which simply may not be undertaken on the record presently before the Court.  Indeed, the contacts that must be examined under the factors of subsection (2) of Section 148 and the principles of Restatement Section 6 require the consideration of facts that are clearly not before this Court on the instant Motion to Dismiss and necessarily preclude this Court's analysis of which state has the most significant relationship to the conduct and the parties.  While there may indeed be instances where a choice of law analysis may be decided on a motion to dismiss, this is not the case here where the factual record is incomplete.  See Lautenberg Foundation v. Madoff, No. 09-816 (SRC), 2009 WL 2928913, at *7  (D.N.J. Sep. 9, 2009) (deferring choice of law analysis on a 12(b)(6) motion until development of factual record); see also  Harper v. LG Elec. USA, Inc., 595 F.Supp.2d at 490.  Accordingly, the Court will defer its choice of law analysis on Arcand's NJCFA claim until the factual record is more fully developed.   The Court will thus apply New Jersey law to both Arcand's and Shoosmith's claims preliminarily for the purpose of determining whether Plaintiffs' NJCFA claims can withstand the instant Motion to Dismiss.

14

### 2.      Plaintiffs' Claim Under the NJCFA

"To state a cause of action under the [NJ]CFA, a plaintiff must allege: (1) an

unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal

nexus between the first two elements - defendants' allegedly unlawful behavior and the

plaintiff's ascertainable loss." Parker v. Howmedica Osteonics Corp., No. 07-02400 (JLL),

2008 WL 141628, at *2 (D.N.J. Jan. 14, 2008) (citing New Jersey Citizen Action v.

Schering-Plough Corp., 367 N.J. Super 8, 13 (App. Div. 2003)).  BIC contends that the

Complaint fails to set forth the three requirements and does not satisfy  Fed. R.Civ. P. 9(b)

particularity pleading requirements.  In Frederico v. Home Depot, 507 F.3d 188 (3d Cir.

2007), the court elucidated what must be alleged to satisfy the heightened pleading

standard of Rule 9(b):

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the
> alleged fraud with sufficient particularity to place the defendant on notice of the
> "precise misconduct with which [it is] charged."  To satisfy this standard, the
> plaintiff must plead or allege the date, time and place of the alleged fraud or
> otherwise inject precision or some measure of substantiation into a fraud allegation.

Id. at 200 (internal citations omitted).

### a.      Unlawful Conduct

Initially, Plaintiffs' NJCFA claim must contain specific allegations of BIC's unlawful

conduct, subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). To that

end, BIC argues that Plaintiffs fail to sufficiently allege the first element of a NJCFA

claim, an unlawful practice.  The pertinent part of the NJCFA reads:

> [t]he act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, false promise, misrepresentation, or the
> knowing, concealment, suppression, or omission of any material fact with intent
> that others rely upon such concealment, suppression or omission, in connection with

15

the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

N.J.S.A. § 56:8-2.  "The NJCFA creates three categories of unlawful practices: affirmative acts, knowing omissions, and violations of state regulations."  Vukovich v. Haifa, No. 03-737 (FLW), 2007 WL 655597, at *9 (D.N.J. Feb. 27, 2007).  Although the wording in the Complaint seems to allege a knowing omission, (Compl. at ¶ 62(a), (b) ("Failing to disclose . . .")), Plaintiffs' Opposition clarifies that the alleged unlawful act is "the misrepresentation of 'empty,'" but "[e]ven if this were a pure omission claim, rather than an affirmative act, the claim would still be valid under the NJCFA."  Opp'n at 37.

The common thread that pervades all types of unlawful conduct is "[its] capacity to mislead."  Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994) (citing Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 378 (1977)).  Importantly, the conduct, whether it be an omission or active misrepresentation, must be made "in connection" with the sale or advertisement of a product or service.  Castro v. NYT Television, 370 N.J. Super. 282, 294 (App. Div. 2004).  Beyond these common elements, there are several differences.  See Leon v. Rite Aid Corp., 340 N.J.Super. 462, 468 (App. Div. 2001) ("This statutory scheme distinguishes between wrongs committed by affirmative acts and wrongs committed by a failure to act").  First, allegations of an affirmative act, i.e. a misrepresentation, do not require a showing of intent or even actual deceit or fraud. Cox, 138 N.J. at 17-18; Leon, 340 N.J.Super. at 468.  "One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive."  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605 (1997).  Nor must the representation

16

be one of material fact, as clarified by the Appellate Division in <u>Leon</u>:

> We do not read [<u>Rodio v. Smith</u>, 123 N.J. 345 (1991)] for the proposition that a plaintiff must prove a misstatement of material fact when claiming an affirmative act of misrepresentation, although the abbreviated manner in which the Court therein quoted the statute might lead to such a conclusion. Grammatically, "material fact" is within the second part of a compound subject describing that which the statute declares to be an unlawful practice. The statutory elements are in the disjunctive.

<u>Leon</u>, 340 N.J. Super. at 470.

In contrast, an omission occurs where the defendant (1) knowingly concealed (2) a material fact (3) with the intention that the consumer rely upon the concealment. <u>Judge v. Blackfin Yacht Corp.</u>, 357 N.J. Super. 418, 426 (App. Div. 2003) (citing <u>Feinberg v. Red Bank Volvo, Inc.</u>, 331 N.J.Super. 506, 511 (App. Div.2000)).  Implicit in the showing of an omission is the underlying duty on the part of the defendant to disclose what he concealed to induce the purchase. Obviously, there can be no fraud, or reliance for that matter, if the defendant was under no obligation to disclose the information in the first place.  Again, the parties dispute the character of Plaintiffs' allegations, i.e. whether BIC's actions as alleged were misrepresentations or omissions.  Thus, the Court must first determine what type of unlawful conduct is implicated by Plaintiffs' allegations before turning to the question of whether the allegations are sufficient to state a claim of unlawful conduct under the NJCFA.

At the outset, the Court notes that the Complaint can be construed as asserting two sets of allegations, those that concern the representations (or lack thereof) made at the time of purchase of the printer and those made in conjunction with the purchase of toner cartridges, i.e. the alleged misrepresentation of "empty" on the printer.  Indeed, in the

Complaint, Plaintiffs describe the Nature of the Action as follows:

> 2.  Brother-brand laser printers are deliberately designed to
> indicate that the toner cartridges used in the printer are "empty"
> and must be replaced when, in fact, large amounts of useable toner
> remain in purportedly empty toner cartridges.  Furthermore,
> Brother-brand laser printers employ a "forced shutdown" that
> deliberately prevents ALL printing operations until the purportedly
> empty toner cartridge is replaced, notwithstanding the fact that a
> large amount of useable toner remains in the purportedly empty
> toner cartridge.

> 3.  This action arises from the fact that BIC does not inform –
> indeed conceals – from its customers that a large amount of useable
> toner remains in the toner cartridge at the point that Brother-brand
> laser printers indicate that the toner cartridge is "empty" and needs
> to be replaced.  Relying on BIC's warning message, users
> prematurely purchase replacement cartridges.  In addition, and no
> less significant, users are prevented from using the large amount of
> very expensive toner that they purchased and which remains in the
> purportedly empty toner cartridge.

Compl. ¶¶ 2-3.  However, in the context of this Motion to Dismiss, Plaintiffs expressly

disclaim the former, arguing that the latter, the active misrepresentation of "empty," is the

unlawful conduct that caused the harm.  Opp'n at 35, 36.  Ultimately, it appears that

Plaintiffs wish to limit their claims to the printer cartridges themselves and the alleged

losses suffered with respect to the unused toner that remained.[5]

_____

[5]     To the extent that Plaintiffs' Complaint could be construed as alleging that
they were deprived the full value of their printer purchases because BIC packaged its
printers with a mechanism that would prematurely cease print operations and force
customers to buy more BIC products, the claim would nevertheless fail on the instant
Motion.  While it is true that allegations of a "failure to disclose" on the part of a defendant
are often construed as omissions under the Act, see Gennari, 148 N.J. at 605 ("For liability
to attach to an omission or failure to disclose, however, the plaintiff must show that the
defendant acted with knowledge"); Unique Custom Landscaping v. Sterman, No. 13368-06,
2009 WL 2461171, at *4 (N.J. App. Div. Aug. 13, 2009) ("An omission or failure to disclose
a material fact, if accompanied by knowledge and intent, is sufficient to violate the CFA"),
Plaintiffs fail to allege any omitted facts, or any facts for that matter, relating to the

To support the argument that the Complaint solely alleges a misrepresentation, Plaintiffs analogize the present case to <u>Leon</u> and focus this Court's attention on the printer's "empty" notification. In <u>Leon</u>, the court found that the plaintiffs, complaining of Rite-Aid's advertising campaign of having the "lowest and best" prices when in fact there was a two-tier pricing scheme for differently situated customers, properly plead an NJCFA claim where it was alleged that Rite-Aid not only failed to disclose its two-tier pricing system to customers, but sought to actively conceal that arrangement. <u>Leon</u>, 340 N.J. Super. at 471. Here, the Court agrees that an active misrepresentation may be found in the "Toner Life End" message displayed on the printers. The fact that BIC simultaneously failed to disclose that the cartridge was not empty does not convert the claim into one of omission. The Act clearly recognizes three types of unlawful conduct, (1) misrepresentations; (2) omissions; and (3) regulatory violations. Given that the Act is remedial legislation to be construed liberally in favor of consumers, <u>see 539 Absecon Blvd., L.L.C. v. Shan Enterprises Ltd. Partnership</u>, 406 N.J.Super. 242, 274 (App. Div. 2009), the Court finds that Plaintiffs' allegations fit into the category of affirmative acts, i.e. misrepresentations actionable under the NJCFA.

The Court also rejects BIC's contention that the misrepresentations alleged here cannot constitute unlawful conduct under the NJCFA because they were not made in any advertisement or sales pitch of BIC products. In examining Plaintiffs' claim, this Court is mindful that the Act "does not cover every sale in the marketplace. . .[ and its] applicability hinges on the nature of a transaction, requiring a case by case analysis." <u>Papergraphics International, Inc. v. Correa</u>, 389 N.J.Super. 8, 13 (App. Div. 2006). However, nothing in

purchases of the printers that could form the basis for such a claim. This is undoubtedly because Plaintiffs have chosen to limit their claims to the printer cartridges themselves.

the language or legislative history of the NJCFA suggests that a misrepresentation or omission under the Act is so limited as to only include statements made through advertising.  For liability to attach, the unlawful conduct must merely relate to a seller's interest in selling his merchandise, whether that be a face-to-face distortion of the nature of the product between salesperson and in-store consumer, a contractor's gross exaggeration of his qualifications to a prospective homeowner in need of renovations, or a more complicated scheme as alleged here, where the seller packages its products with a mechanism that induces its buyers to purchase another of its products to generate more revenue.  Assuming Plaintiffs' allegations are true, and in light of BIC's explicit disclaimer that consumers are highly discouraged from purchasing any other toner besides those manufactured and distributed by BIC, BIC formatted its printers with a function that would compel its customers to prematurely and unnecessarily buy more of its toner cartridges.  It is readily apparent to this Court that such a practice is "in connection with" the sale or advertising of merchandise as BIC certainly expected that its consumers would purchase more toner when the printer indicated the user cartridge was empty and the printer shut down.

Moreover, if Plaintiffs' allegations are true, and there was usable toner left, a consumer would nevertheless likely believe that the cartridge was empty when the printer indicated as much and precluded the user from continuing to print.  "Affirmative acts prohibited by the Consumer Fraud Act, including conduct such as alleged in our situation, require no showing of intent."  Gross v. Johnson & Johnson-Merck Consumer Pharm., 303 N.J.Super. 336, 346 (Law Div. 1997) (citing Cox, 138 N.J. 2).  It is, in short, enough to state unlawful conduct under the NJCFA, that the statement is not factually accurate and was

made in the connection or sale of merchandise.  See Solo v. Bed Bath & Beyond, Inc., No. 06-1908 (SRC), 2007 WL 1237825, at *3 (D.N.J. Apr. 26, 2007)  (dismissing the plaintiff's NJCFA claim but finding that he adequately plead unlawful conduct when he alleged that the sheets he purchased falsely advertised they were of a much greater quality).  Here, the statement was made to induce the purchase of a new BIC toner cartridge, and thus, was made in the connection or sale of merchandise.  In sum, the Court concludes that Plaintiffs adequately plead that BIC engaged in unlawful conduct when it allegedly misrepresented that the toner cartridge was "empty" when there was toner remaining.

### b.    Ascertainable Loss

The Court will now consider whether Plaintiffs  adequately plead ascertainable loss as required under the NJCFA. Plaintiffs insist that the ascertainable loss is not, as BIC contends, the diminished value of their printers, but rather the value of <u>all</u> the toner discarded once the printer prevented a consumer from using "spent" toner cartridges.  The Court agrees that Plaintiffs, in asserting claims pursuant to the NJCFA, seek redress for damages in the "amount of the percentage of the purchase price corresponding with the percentage of toner remaining at shutdown in each toner cartridge purchased plus interest for which they are entitled to legal and equitable relief, including treble damages."  Compl. ¶63.[6]  Nevertheless, the Court must still determine whether their allegations are sufficient

---

[6]Almost in passing, Plaintiffs allege that their loss also includes the difference in value of the printer they purchased, one with a shutdown mechanism, as opposed to one without.  This, however, is far too nebulous an allegation to state an ascertainable loss under the NJCFA.  To state that they have suffered an ascertainable loss, Plaintiffs must allege the printer they did receive was of lesser value than what was promised.  See Solo, 2007 WL 1237825, at * 3.  Here, Plaintiffs' theory of ascertainable loss with respect to the value of the printer encounters two problems in that it is devoid of allegations: (1) that Plaintiffs expected a printer <u>without</u> a shutdown mechanism; and (2) that Plaintiffs have suffered a measurable out of pocket loss with respect to the printer they now own.  See <u>also</u> n.8 <u>infra</u>.

to state an ascertainable loss under the NJCFA.

Recognizing "[t]here is little that illuminates the precise meaning that the Legislature intended in respect of the term 'ascertainable loss' in [the NJCFA]," New Jersey courts have been chary to ascribe the term a precise meaning. Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248 (2005).  Generally, an ascertainable loss occurs "when a consumer receives less than what was promised."  Union Ink Co., Inc. v. AT&T Corp., 352 N.J.Super 617, 646 (App. Div. 2002); Solo, 2007 WL 1237825, at *3 (quoting Miller v. American Family Publishers, 284 N.J.Super 67, 90-91 (N.J. Ch. 1995) ("'For their money, they received something less than, and different from, what they reasonably expected in view of defendant's presentations.  That is all that is required to establish ascertainable loss . . . .").  The statute does not require that the loss be monetary nor that it must be plead beyond a reasonable degree of certainty. See Cox, 138 N.J. at 22 ("The Appellate Division majority suggests that because Cox did not spend money to repair or finish the work, he incurred no loss.  However, that interpretation of N.J.S.A. 56:8-19 runs contrary to the Act's clearly remedial purpose").  At the very least, a consumer must be able to quantify or measure what loss he has suffered or will suffer as a result of the unlawful conduct.  Perkins v. DaimlerChrysler Corp., 383 N.J.Super 99, 106 (App. Div. 2006); Theidmann, 183 N.J. at 248 (finding that implicit in the term ascertainable is some modicum of measurability or quantity of what was lost due to the defendants' unlawful conduct).[7]

_____

[7]Plaintiffs rely on the decision in Baggett v. Hewlett-Packard Company, 582 F.Supp.2d 1261 (C.D. Cal. 2007), which held, inter alia, that despite the defendant's disclaimer that its users would only receive an average of 5,000 pages per cartridge, the defendant's actions in falsely indicating that the cartridge was "empty" where there was usable toner left was a fraudulent act, and denied the defendant's motion to dismiss the plaintiff's claims.  In doing so, the Court held that the plaintiffs properly stated claims for

Plaintiffs' theory of ascertainable loss proceeds along a benefit-of-the-bargain analysis: in purchasing BIC's printer cartridges, BIC sold them a product worth considerably less than originally promised.  When pleading a benefit-of-the-bargain loss, the plaintiff must allege "the difference between the [product] she received and the [product] as represented at purchase."  Romano v. Galaxy Toyota, 399 N.J.Super. 470, 484 (App. Div. 2008).   The flaw in Plaintiffs' theory of loss is that Plaintiffs do not allege why they believed that the toner's life was tied to the amount of ink in the cartridge, leaving this Court to speculate as to whether this expectation was objectively reasonable, and more importantly, whether what Plaintiffs received was ostensibly less than what BIC promised. What the Court can discern from Plaintiffs' allegations and the relevant documents incorporated by reference is that Plaintiffs were well aware, according to the user manual, that the toner cartridges printed up to a certain number of pages.  Plaintiffs do not allege what they did receive, i.e., an amount of pages less than what the manual stated, nor do they allege what spurred them to believe that the printer and its cartridges were supposed to produce more than promised in the user manual.  Thus, this Court cannot determine what loss, if any, Plaintiffs sustained as they fail to allege in the Complaint any particulars as to their own experiences with BIC printers and cartridges.  That Plaintiffs envisaged a toner cartridge which would last the life of the ink does not engender an ascertainable loss.  Rather, the loss must be within the objective expectations of the consumer based on the representations made.

---

fraudulent concealment, unjust enrichment, trespass to chattels, and violations of California Unfair Competition Law.  Id. at 1267-71.  The Court observes, however, the Baggett court's recent decision to dismiss several of the plaintiff's claims, including claims for unfair competition, fraudulent concealment, conversion, and trespass to chattels, on a motion for summary judgment.  See Baggett v. Hewlett-Packard Company, No. 08-0067, 2009 WL 3178066 (C.D. Cal. Sept. 29, 2009).

The approach taken in <u>Solo v. Bed, Bath & Beyond, Inc.</u>, No. 06-1908 (SRC), 2007 WL 1237825 (D.N.J. Apr. 26, 2007), and <u>Franulovic v. Coca-Cola Company</u>, No. 07-539 (RMB), 2007 WL 3166953 (D.N.J. Oct. 25, 2007), proves instructive and convincing.  In <u>Solo</u>, the plaintiff purchased what he believed to be 1000 thread count sheets from defendant.  Upon learning that the sheets were of a significantly lower thread count, approximately 492, the plaintiff filed suit, claiming, <u>inter</u> <u>alia</u>, that the defendant was in violation of the NJCFA.  In finding that the plaintiff failed to sufficiently plead ascertainable loss, the court stated:

> Plaintiff fails to specifically allege that what he did receive[] was of lesser value than what was promised, <u>i.e.</u>, that the sheets he received were worth an amount of money less than the sheets he was promised, or that he experienced a measurable out-of-pocket loss because of his purchase. Therefore, Plaintiff has failed to set forth either an out-of-pocket loss or a demonstration of loss in value sufficient to satisfy the ascertainable loss requirement. <u>See</u> <u>Theidemann</u>, 183 N.J. at 248 (The "certainty implicit in the concept of an 'ascertainable loss' is that [such loss] is quantifiable or measurable.").

<u>Solo</u>, 2007 WL 1237825 at *3. Similarly, in <u>Franulovic</u>, the consumers complained of a carbonated beverage which promised to help burn more calories than consumed, a claim they alleged was untrue and uncorroborated.  In dismissing the plaintiffs' NJCFA claims, the court, primarily relying on the reasoning first expressed in <u>Solo</u>, held that the plaintiffs did not plead an ascertainable loss when they failed to allege facts pertinent to their own personal experiences with the product.  <u>Franulovic</u>**,** 2007 WL 3166953, at *8-9, 11.

The Court disagrees with Plaintiffs that <u>Solo</u> and <u>Franulovic</u> are inapposite. Tasked with differentiating <u>Solo</u> and <u>Franulovic</u>, Plaintiffs resort to tautology, insisting they have sufficiently plead ascertainable loss without explaining why the Complaint does

not suffer from the same pleading defects that proved fatal in <u>Solo</u> and <u>Franulovic</u>.  In evaluating whether a plaintiff has suffered an ascertainable loss, the Court need not countenance "hypothetical or illusory" losses or the wholly subjective expectations of a consumer.   Nevertheless, Plaintiffs' theory calls for exactly that, for this Court to credit Plaintiffs' bald allegations that when they purchased their printers and cartridges, they inexplicably expected to be able to print to the very last drop of toner, irrespective of BIC's explicit disclosure that the toner provides <u>up to</u> a certain number of pages.  The value Plaintiffs have assigned to their purchases cannot be characterized as an objective expectation without more specificity.   <u>See</u> <u>Perkins</u>, 383 N.J.Super. at 106.

Possibly recognizing that the Complaint fails to adequately plead ascertainable loss, Plaintiffs strain to limit this Court's attention to the printer's "Toner Life End" message without mention of the material representations BIC may have made on the packaging of the toner cartridges, the cartridges themselves, or in the user manual.   Focusing solely on the printer, Plaintiffs would have this Court believe that their expectation in receiving the full amount of toner is objectively justified and the page limit disclosures in the user manual, and presumably, on the toner cartridge packaging, are merely surplusage.  However, Plaintiffs fail to provide any explanation why these representations, the number of pages they <u>did</u> receive and the number of pages promised, can be decoupled from their claims of consumer fraud with respect to the printer's shutdown mechanism.  Given the underlying theory of Plaintiffs' case, that BIC's "razor-and-blades" business model operated in such a way as to force consumers to needlessly buy more toner cartridges, it is implausible for Plaintiffs to suggest that this Court not look to both the printer, its packaging and user manual, and the cartridges, and the representations made by both

products, to determine whether the consumer has suffered an ascertainable loss. Otherwise, under the approach proposed by Plaintiffs a consumer could attach his or her own subjective value to a product without reference to what was expected at the time of purchase by a reasonable consumer.

Finally, the Court rejects Plaintiffs' theory of ascertainable loss under the NJCFA. At its core, the Act seeks to "protect the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services," Fenwick v. Kay American Jeep, Inc., 136 N.J.Super. 114, 117 (App. Div. 1975), *rev'd on other grounds*, 72 N.J. 372 (1977), and over time, "the history of the Act is one of constant expansion of consumer protection." Gennari, 148 N.J. at 604. But the notion that the Act provides a windfall to consumers or should be interpreted in such a way as to run afoul of the adage that, a consumer is only entitled to what he pays for, is unsupported by the applicable case law and the corresponding legislative history. Any such approach would severely compromise the capacity of companies like BIC to operate and would place them in a Catch-22: produce a printer cartridge without a page limit that would permit a consumer to use all the toner, even where this may lead to substandard printing and possibly expose BIC to claims of defective design, or, on the other hand, place an explicit page limit on its toner that ensures the highest print quality only to find itself defending against claims of fraudulent misrepresentation and false advertising.  Certainly, this would be a much different case if Plaintiffs received materially less than the amount of pages specified in the user manual.  However, the facts as they are alleged do not allow this Court to engage in that inquiry.  As to this point, the Court shares the same concerns expressed by Judge Easterbrook in Schorsch v. Hewlett-Packard Company, 417 F.3d 748

(7th Cir. 2005):

> This may mean that plaintiffs lose (and quickly) across the board: no rule of law requires drum kits or toner cartridges or any other consumer product to last for any prescribed period.  If it would be lawful in Illinois for HP to fill cartridges with enough toner to last (on average) 3,000 pages, why would it not be lawful to include more toner (enough to <u>ensure</u> 3,000 pages of use) and then require replacement at that point, before the streaking and spotty output that marks the end of a cartridge's supply of toner? Consumers are better off with the second kind of cartridge than with the first.  Much the same may be said for ink cartridges and drum kits.  If HP had promised that its toner cartridges would last for 3,500 pages, then used an EEPROM to shut them down after 3,000, Schorsch would have a better claim, but this does not appear to be the class's theory.[8]

Although Plaintiffs and the <u>Baggett</u> court are correct to label this language <u>dicta</u>, Plaintiffs cannot escape the <u>Schorsch</u> court's unflappable logic: in purchasing a product that comes with an explicit disclaimer of its limits, consumers cannot later complain that the product <u>should</u> yield more than explicitly promised. It is undisputed that BIC <u>could have</u>, without exposing itself to liability, provided no more toner than absolutely necessary to print a predetermined set of pages.  Holding otherwise yields a perplexing and anomalous result -- providing legal redress for consumer fraud against a defendant who provides its consumers with a product that performs as exactly advertised in its user manual.   Accordingly, the Court finds that Plaintiffs fail to plead an ascertainable loss and their NJCFA claim is dismissed.  However, since Plaintiffs could potentially plead ascertainable loss by providing this Court with factual allegations concerning their individual experiences with their printers and the number of pages they received, Plaintiffs shall have twenty days to file an amended NJCFA claim.

---

[8]Plaintiffs also argue that they, and not BIC, should have the right to control the quality of printing.  That observation, however, does nothing to advance Plaintiffs' argument that the shutdown mechanism works in such a way to as to deprive them of the total value of their purchase.

c.      **Causal Nexus**

Although this Court finds Plaintiffs cannot sustain a claim under the NJCFA for failure to allege an ascertainable loss, for completeness, the Court shall consider whether the Complaint properly pleads a causal relationship between the unlawful conduct and hypothetical loss Plaintiffs may have suffered.  The third element a plaintiff must allege to state a claim under the NJCFA is a "causal relationship" between the defendants' unlawful conduct and the plaintiff's ascertainable loss.  Miller, 284 N.J.Super. at 76; Frederico, 507 F.3d at 202; see also Thiedemann, 183 N.J. at 246. In order to properly plead this element, Plaintiffs must allege facts establishing a causal nexus with the particularity required by Rule 9(b).  In Dewey v. Volkswagon, the court found that a plaintiff had not sufficiently plead a "causal nexus" within "Rule 9(b)'s strictures" by alleging misrepresentations made by the defendant and plaintiff's injury "in only the most general and conclusory terms." Dewey v. Volkswagon, 558 F.Supp.2d 505, 526 (D.N.J. 2008).  The court noted that the allegations made by the plaintiff were "legal conclusions, not factual allegations that would, if true, establish a 'causal nexus'" because they did not allege when statements were made or when the plaintiffs were exposed to the statements.  Id. at 526-27.  "Without this information, Plaintiffs have not properly plead a 'causal nexus' with the particularity required by Rule 9(b)."  Id.  Hypothesizing what might be required "to demonstrate the required causal nexus" the court noted:

> For example, in order to demonstrate the required causal nexus, Plaintiffs might be expected to plead facts stating whether the allegedly fraudulent statements on the website were on the website at the time that any of the individual Plaintiffs were deciding whether to purchase a Volkswagen, and whether any of the Plaintiffs saw those statements on Volkswagen's website.

Id. at 527, n.19.  Importantly, the NJCFA does not require that the allegedly unlawful conduct serve as the lone cause of Plaintiffs' loss, but merely that it be a cause.  See Zebersky v. Bed Bath & Beyond, Inc., No. 06-1735 (PGS), 2006 WL 3454993 at *4 (D.N.J. Nov. 29, 2006); Vacarello v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 48 (App. Div.2000).[9]  In the Amended Complaint, Plaintiffs allege that they would not have purchased new cartridges for their BIC printers had it not been for BIC's misrepresentations that the toner cartridge is empty.  Such allegations, where the consumer urges that his purchase was the "but-for" consequence of the seller's unlawful conduct, suffice under the NJCFA's causal nexus requirement.  See Strzakowlski v. General Motors Corp., No. 04-4740, 2005 WL 2001912, at *7 (D.N.J. Aug. 16, 2005);  Gross v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 303 N.J.Super. 336, 346.[10] Here, Plaintiffs have alleged a connection between their decision to purchase more cartridges and the supposed misrepresentation that the toner cartridges are empty.

### C.    Fraudulent Concealment Claims

BIC asserts that there are also conflicts between New Jersey and Virginia laws for all non-statutory claims in addition to the NJCFA claim.  The conflict, BIC argues, is that Virginia has a two-year statute of limitations period for fraud claims versus New Jersey's

_____

[9]This is but one of the many distinctions between the NJCFA and its common law fraud counterpart, which requires that the plaintiff rely on the alleged misrepresentations. Dabush v. Mercedes-Benz USA, LLC, 378 N.J.Super. 105, 122 (App. Div. 2005); Gennari, 148 N.J. at 607-608 (holding that reliance is not required in suits under the CFA because liability results from "misrepresentations 'whether any person has in fact been misled, deceived, or damaged thereby'").

[10]BIC is incorrect in its assertion that Gross requires the causal nexus to be one of but for causation.  In Gross, the court held the challenged advertisements were the "but for" cause of the consumer's decision to purchase the defendant's product.  While BIC is right to point out that such an allegation suffices under the NJCFA, neither the Gross court, nor any other faced with the issue, have held consumers to that standard.

Case 3:07-cv-04987-FLW-TJB   Document 53   Filed 11/30/09   Page 30 of 46

six-year statute of limitations. Reply Br. at p. 5. It is well established, however, that "where the application of either state's law would yield the same result, no conflict exists to be resolved." High v. Balun, 943 F.2d 323, 325 (3d Cir.1991); Warriner v. Stanton, 475 F.3d 497, 501 (3d Cir. 2007) (quoting High, 943 F.2d at 325); In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir. 1997). Though there is obviously a difference in the statute of limitations, this conflict is not an actual conflict here because Arcand's fraudulent concealment claims were timely filed within both the New Jersey and Virginia statute of limitations for such claims. See O'Boyle v. Braverman, No. 08-3865, 2009 WL 2038654, at *2 (3d Cir. Jul. 15, 2009) (finding an actual conflict existed where a plaintiff's claims would be barred under Tennessee's, but not New Jersey's, legal malpractice statute of limitations). Equally unavailing is BIC's suggestion that Plaintiffs' "fraudulent concealment claims are more likely to fail in Virginia (where they must be proven by clear and convincing evidence) than in New Jersey (where a preponderance suffices). Cf., Daibo v. Kirsch, 316 N.J. Super. 580, 588 (App. Div. 1998) and Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999)." Reply Br. at 4. Contrary to BIC's contention, the standards of proof on fraud claims do not differ in New Jersey and Virginia. "New Jersey requires clear and convincing evidence" for fraud claims. American Senso RX, Inc. v. Banner Pharmcaps, Inc., No. 06-1929 (FSH), 2006 WL 2583450, at *6 (Sep. 6, 2006) (citing Lithuanian Commerce Corp. v. Sara Lee Hosiery, 214 F.Supp.2d 453, 458 (D.N.J. 2002)). Thus, the Court finds there is no conflict between the fraud laws of New Jersey and Virginia,[11] and as

---

[11]This Court notes that a claim of fraudulent concealment in Virginia puts a plaintiff to the same proofs. Under Virginia law, "[t]he elements of a cause of action for fraud are: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance on the party misled; and (6) resulting damage to the party misled." Colinsky Consulting Inc. v. Holloway, 57 Va. Cir. 403 (Va. Cir. Ct. 2002).

such, New Jersey's common law applies to both Plaintiffs' fraud claims.

In order to plead fraudulent concealment in New Jersey, a plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resulting damages." Gennari, 148 N.J. at 610. "The '[d]eliberate suppression of a material fact that should be disclosed' is viewed as 'equivalent to a material misrepresentation (i.e., an affirmative misrepresentation),' which will support a common law fraud action." Winslow v. Corporate Express, Inc., 364 N.J. Super. 128, 139 (App. Div. 2003) (citing N.J. Economic Development Authority v. Pavonia Restaurant, Inc., 319 N.J. Super. 435, 446 (App. Div. 1998)). The elements of fraudulent concealment must also be plead under the heightened standards of Fed. R. Civ. P. 9(b). Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 626 (3d Cir. 1984). BIC argues that Plaintiffs fail to allege a material misrepresentation, a reasonable reliance on the part of the Plaintiffs, or damages. BIC also asserts that Plaintiffs failed to plead with the specificity required by Fed. R. Civ. P. 9(b).

Importantly, "New Jersey courts will not imply a duty to disclose" in a case alleging fraudulent concealment. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993). The question of whether there is a duty to disclose, constituting a fraudulent concealment, is a matter of law. Salovaara v. Jackson National Life Insurance Co., 66 F. Supp. 2d 593, 602 (D.N.J. 1999) (citing United Jersey Bank v. Kensey, 306 N.J.Super. 540, 551 (Law. Div. 1997)), aff'd, 246 F.3d 289 (3d Cir. 2001) . The duty to disclose arises in the following three types of relationships:

(1) fiduciary relationships, such as principal and agent, client and attorney,

> or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties.

Lightning Lube, 4 F.3d at 1185; see Maertin v. Armstrong World Industries, Inc., 241 F.

Supp. 2d 434, 461 (D.N.J. 2002).

As previously noted, indispensable to any claim of fraud is justifiable and reasonable reliance. A party reasonably relies on a misrepresentation where the "facts to the contrary were not obvious or did not provide a warning," or where the relying party did not reasonably "pursue further investigation" that would have revealed "the falsity of the representation." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 189 N.J.Super. 347, 355 (App. Div.1983), rev'd in part on other grounds, 97 N.J. 37 (1984). Here, Plaintiffs have not explained why it would be reasonable to rely on the printer's "empty" notification when the user manual clearly indicates that the cartridge only provides the user a predetermined number of pages. Plaintiffs cannot choose which portions of the user manual they will rely on to their alleged detriment and which should be blatantly disregarded. Clearly, upon reading the user manual, Plaintiffs would have realized that the number of pages, and not the weight of the cartridge, governed the life expectancy of the cartridge. Moreover, based on Plaintiffs' reliance on the user manual in their Complaint, Plaintiffs were well aware that the cartridge is not technically empty when the shutdown mechanism initiates, and as a result, the shutdown mechanism signals that the user has reached the amount of pages that may be printed by a single cartridge.

Curiously, Plaintiffs have not explained in their Complaint what representations, if

any, were made on the toner cartridge or printer packaging, and while the Court cannot

speculate as to what import that omission has on this case, the Court cannot find that

Plaintiffs reasonably relied on the sole alleged misrepresentation particularly where other

material facts, such as whether there was an indication on the packaging of the toner

cartridge of how many pages a cartridge does print, have not been pled.  For instance, if

the box of the toner cartridge or the printer itself clearly highlighted that the toner's life

expectancy was tied to pages, similar to the disclaimer included in the user manual for the

printer, Plaintiffs would have been duly warned that the "empty" notification does not

signify that the cartridge has been drained of every last drop of toner.

Moreover, for many of the same reasons why Plaintiffs have not suffered an

ascertainable loss under the NJCFA, the Court finds that Plaintiffs have not alleged here

that they sustained resultant damages flowing from BIC's purported fraudulent conduct.

Some actual damage is essential to a claim of fraud or deceit.  Holmin v. TRW, Inc., 330

N.J.Super. 30, 36 (App. Div. 2000), aff'd, 167 N.J. 205 (N.J. 2001).  The facts as they are

alleged do not permit the Court to find that Plaintiffs suffered even a modicum of damages

as a result of the shutdown mechanism.  Indeed, as stated above, it would not make much

sense at all for this Court to hold BIC accountable for fraudulent concealment if BIC could,

without exposing itself to liability, provide just enough ink to print the number of pages

provided in the user manual. In that case, Plaintiffs would be in the same position as they

were when the printer shut down with usable toner remaining in the cartridge, a cartridge

that has reached the end of its life and satisfied the consumer's expectations.  See

Schorsch, 417 F.3d at 751.  It only follows then that Plaintiffs, in purchasing new

cartridges when their printers shut down, could not have relied on the "empty" indication

message to their detriment <u>if</u> they received the number of pages specified in the user manual.

The dismissal of Plaintiffs' fraudulent concealment claims necessarily compels this Court's discussion of the recent decision in <u>Knox v. Samsung Electronics, America, Inc.</u>, No. 08-4308, 2009 WL 1810728, at *1 (D.N.J. June 25, 2009). In <u>Knox</u>, the district court permitted the plaintiffs to proceed with their fraudulent concealment claims concerning a printer that shut down, indicating the cartridge was "empty" when usable toner remained inside. The defendant vigorously argued that the specified page yield, an estimated average of pages consumers were supposed to receive, was fully disclosed in the user manual in such a way that the consumer could not reasonably rely on the "empty" message on the printer. Finding <u>Baggett</u> persuasive, the <u>Knox</u> court found that because the printer cartridge was not empty when the mechanism indicated otherwise, and the consumers, to their detriment, purchased another cartridge when more pages could have been printed, the plaintiffs could proceed with their fraudulent concealment claim.

The Court finds both <u>Baggett</u> and <u>Knox</u> are readily distinguishable from the present case as Plaintiffs presently do not allege the fourth and fifth prongs, reasonable reliance and resultant damages. In both <u>Baggett</u> and <u>Knox</u>,[12] the printers' user manuals and other accompanying materials explicitly provided estimated page yields, i.e. an average number

---

[12]Importantly, the <u>Baggett</u> court, taking the plaintiff's allegations as true, found that the printer's maintenance section gave an average life, and not, as Hewlett-Packard contended, a maximum page limit, for its printer cartridges. Based on that assumption, the court held that the consumers' reasonable expectation was the full amount of ink in the toner. However, discovery later revealed that Hewlett-Packard explicitly represented in its user manual that its toner cartridges yield a maximum amount of pages. In light of this evidence, the <u>Baggett</u> court dismissed the plaintiff's fraud claims, stating: "Plaintiff was never assured that he would have the use of any toner beyond that required to print 2,000 color pages." <u>Baggett</u>, 2009 WL 3178066 at *3.

of pages a consumer could expect to receive.  Implicit in the concept of a printer's average

page yield is the reasonable expectation that some cartridges will yield less while others

more.  Presumably, the shutdown mechanism in both <u>Baggett</u> and <u>Knox</u> limited users to a

page yield below or just at the average number of pages, precluding the user from realizing

a reasonable return, a number of pages slightly above the average indicated in the user

manual.  Thus, it  is perfectly sensible for both <u>Baggett</u> and <u>Knox</u> to find as they did, that

more pages than the average would be within the reasonable expectations of the consumer.

However, neither <u>Baggett</u> nor <u>Knox</u> dealt with the representations made to the

consumers in this case: a cartridge that has an explicit representation regarding the

maximum number of pages that may or may not have been reached when the printer shut

down.  <u>See</u> footnote 12, <u>supra</u>.  Moreover, as stated <u>supra</u>, the <u>Baggett</u> court recently

dismissed the plaintiff's fraudulent concealment claims on a motion for summary

judgment, finding <u>inter alia</u> that Hewlett-Packard retained no duty to disclose the fact that

toner remained in the cartridge after the shutdown mechanism initiated, or that the

plaintiff actually relied on the misrepresentation that the cartridge was indeed empty,

when she changed her cartridge.  Accordingly, the Court finds that Plaintiffs fail to allege a

fraudulent concealment claim under New Jersey law. However, the Court shall give

Plaintiffs twenty days to amend their Complaint with allegations concerning the amount of

pages they did receive and the totality of the representations they received from BIC's

promotional and packaging materials.

### D.    Economic Loss

Before turning to Plaintiffs' remaining trespass to chattels and conversion claims,

this Court will address BIC's argument that the economic loss doctrine bars those claims.[13]

"The economic loss rule 'defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases." Dean v. Barrett Homes, Inc., 406 N.J. Super. 453, 470 (App. Div. 2009) (quoting R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L.Rev. 1789 (2000)), *certif. granted,* 200 N.J. 207 (N.J. 2009).   "The purpose of the rule is to 'strike an equitable balance between countervailing public policies,' that exist in tort and contracts law.'" Id., (quoting Genady A. Gorel, Note, *The Economic Loss Doctrine: Arguing for the Intermediate Rule and Taming the Tort-eating Monster*, 37 Rutgers L.J. 517, 524 (2006)).

Generally, the economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which they are entitled only by contract.  Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 310 (2002).  Whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties.  Capital Plus Equity, LLC v. Prismatic Development Corp., No. 07-321, 2008 WL 2783339, at *6 (D.N.J. July 16, 2008) (citation omitted); Touristic Enterprises Co. v. Trane Inc., No. 09-02732 (SRC), 2009 WL 3818087, at *2 (D.N.J. Nov. 13, 2009).  For instance, a plaintiff may be permitted to proceed with tort claims sounding in fraud in the

---

[13]      BIC has not similarly sought to bar Plaintiffs' statutory and common law fraud claims under the economic loss doctrine and the Court will not *sua sponte* address whether those claims fall within the scope of the doctrine.  Additionally, the Court notes that BIC raises the economic loss doctrine under both New Jersey and Virginia law, however, because the Court finds that New Jersey law applies to both the trespass to chattels and conversion claims, and the parties have not raised any choice of law issues as to the doctrine, the Court will only consider whether New Jersey's economic loss doctrine precludes Plaintiffs' claims for conversion and trespass to chattels.

inducement so long as the underlying allegations involve misrepresentations unrelated to
the performance of the contract, but rather precede the actual commencement of the
agreement.  Metex Manufacturing Corp. v. Manson, No. 05-2948, 2008 WL 877870, at *4
(D.N.J. Mar. 28, 2008); Unifoil Corp. v. Cheque Printers & Encoders Ltd., 622 F. Supp.
268, 271 (D.N.J. 1985) (finding that courts have "construed the law of New Jersey to
prohibit fraud claims when the 'fraud contemplated by the plaintiff. . .does not seem to be
extraneous to the contract, but rather on fraudulent performance of the contract itself.'");
but see Kirtley v. Wadekar, No. 05-5383 (JAG), 2006 WL 2482939, at *4 (D.N.J. Aug. 25,
2006).  In Bubbles N' Bows, LLC v. Fey Pub. Co, No. 06-5391 (FLW), 2007 WL 2406980, at
*10 (D.N.J. Aug. 20, 2007), this Court elaborated on the rationale for the economic loss
doctrine, stating that "[t]ort principles, such as negligence, are better suited for resolving
claims involving unanticipated injuries, and contract principles are generally more
appropriate for determining claims for consequential damages that parties have or could
have address[ed] in their agreement."

    To be barred by the economic loss doctrine, the claims must be duplicative of those
provided for under the U.C.C.  Alloway v. General Marine Industries, L.P., 149 N.J. 620,
641 (1997).  Indeed, the New Jersey Supreme Court has held

        In addition to the right to recover under the U.C.C., victims of fraud
        or unconscionable conduct possess substantial rights to recover for
        common-law fraud or for violations of various state and federal
        statutes.  The U.C.C. expressly provides that "[u]nless displaced by
        the particular provisions of this Act, the principles of law and equity,
        including the law merchant [sic] and the law relative to capacity to
        contract, principal and agent, estoppel, fraud, misrepresentation,
        duress, coercion, mistake, bankruptcy or other validating or
        invalidating cause shall supplement its provisions."  See N.J.S.A.
        12A:1-103.  The New Jersey Products Liability Law (the "Law") is to
        the same effect.  N.J.S.A. 2A:58C-1 to -11.  Although the Law

> excludes physical damage to the product itself from the definition of
> "harm," N.J.S.A. 2A:58C-1b(2), the Legislature did not intend to
> codify in the Law all common-law remedies, see Senate Judiciary
> Committee Statement, Senate, No. 2805, L. 1987, c. 197.
> Consequently, the exclusion of physical damage from harm that falls
> within the Law is not dispositive.

Alloway, 149 N.J. at 639-640.  Citing the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1

to -20, the Truth-In-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-1 to -18

and the Magnuson-Moss Warranty Act, 15 U.S.C.A. §§ 2301, 2308, the Alloway Court noted

that other protections are available to defrauded consumers.  Id. at 640-641. Given the

"judicial decisions and statutory enactments" available to protect consumers from

overreaching, the Alloway Court concluded that "a tort cause of action for economic loss

duplicating the one provided by the U.C.C. is superfluous and counterproductive."  Id. at

641.

   The starting point to the economic loss analysis is the loss suffered by the

consumers:

> Preliminarily, economic loss encompasses actions for the recovery of damages
> for costs of repair, replacement of defective goods, inadequate value, and
> consequential loss of profits . . . Economic loss further includes the
> diminution in value of the product because it is inferior in quality and does
> not work for the general purposes for which it was manufactured and sold.

Alloway, 149 N.J. 620, 627 (1997) (internal citations and quotations omitted); Spring

Motors Distributors, Inc., v. Ford Motor Co., 98 N.J. 555, 566 (1985) ("Economic loss can

take the form of either direct or consequential damages.  A direct economic loss includes

the loss of the benefit of the bargain, i.e., the difference between the value of the product as

represented and its value in its defective condition").  Plainly, the allegations in Plaintiffs'

38

Complaint calculate damages as the loss in value between the cartridges they purchased and the ones they received. Indeed, Plaintiffs concede as much in their arguments concerning ascertainable loss under the NJCFA. While it is clear to this Court that the damages sought by Plaintiffs are purely economic, Plaintiffs have limited their Complaint to statutory and common law fraud, and the tort claims of trespass to chattels and conversion, unaccompanied by any UCC or product liability claims.

BIC contends that regardless of how Plaintiffs have labeled their trespass to chattels and conversion claims, they are based on product design and the economic losses sought in those claims may not be recovered in tort. After analyzing relevant State court decisions, where BIC's argument has traction is in the principles that underlie the economic loss doctrine. Concerned that if the law of products liability "were allowed to progress too far, contract law would drown in a sea of tort," the Supreme Court upheld the application of the economic loss doctrine in a defective product case arising under the Court's admiralty jurisdiction. East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866 (1986). The Supreme Court noted "that a manufacturer in a commercial transaction has no duty under negligence or strict products-liability theory to prevent a product from injuring itself." Id. at 871. Otherwise, the Supreme Court continued, a manufacturer would be subject to an unending stream of liability in tort law where the consumer's damages do not exceed the price paid for the product, and the unending stream of liability for foreseeable damages would ultimately extend to all parties in the chain of distribution. Id. at 874.

Likely swayed by this logic, a majority of jurisdictions have adopted some form of the economic loss doctrine. New Jersey, again, is no exception. New Jersey courts have

recognized the U.C.C. as a "comprehensive scheme [that] offers significant protection to consumers while insuring that merchants are not saddled with substantial and uncertain liability." Alloway, 149 N.J. at 630 (citing East River, 476 U.S. at 874)). In support of the doctrine's viability, the Spring Motors court noted the differing interests that drive tort and contract law respectively:

> The demarcation of duties arising in tort and those arising in contract is often indistinct, but one difference appears in the interest protected under each set of principles. Prosser & Keeton, supra, § 92 at 655-56. The purpose of a tort duty of care is to protect society's interest in freedom from harm, i.e., the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises. Generally speaking, tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.

[98 N.J. at 672.]  As the preceding cases demonstrate, the intellectual underpinnings of the economic loss doctrine, to preclude unending liability for suppliers where the injury is limited to the product supplied, applies with equal force in the case at bar.   While this is not a case of defective design or products liability in that the printers function properly and do exactly what BIC programmed them to do, i.e. shut down with usable toner remaining in the cartridge so consumers buy more cartridges, the policy concerns that support the doctrine are equally applicable.   Although Plaintiffs have not sought to vindicate their rights pursuant to any warranty provided, the U.C.C. clearly provides such measures and recovery for resultant damages:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless

40

circumstances show proximate damages of a different amount.

N.J.S.A. 12A:2-714; see also Perth Amboy Iron Works v. American Home Assur. Co., 226 N.J.Super. 200, 219 (App. Div. 1988) ("Thus, diminution in value is the standard measure of damages in breach of warranty cases"), aff'd, 118 N.J. 249 (N.J. 1990).  Plaintiffs counter that the economic loss doctrine is inapplicable because they do not claim, as BIC suggests, that the product is defective or failed to perform as designed.  Citing Saltiel, 170 N.J. 314, Plaintiffs argue that the claims "are intentional torts that arise apart from and independent of any contractual claims and are outside the scope of the economic loss rule." Opp'n Br. at 26.  This Court fails to see  the logic in Plaintiffs' reasoning.  Here, where these intentional tort claims arise directly out of Plaintiffs' disappointed commercial expectations, the Court fails to see how they can be separated from the commercial relationship between Plaintiffs and BIC.  Plaintiffs simply cannot escape the fact that the damages sought in connection with their trespass to chattels and conversion claims are in the nature of economic loss and arise out of Plaintiffs' contention that BIC's product failed to meet performance expectations.  Accordingly, the Court finds that Plaintiffs' claims for trespass and conversion are barred by the economic loss doctrine.  In the interest of completeness, however, the Court will nevertheless address whether Plaintiffs' trespass to chattels and conversion claims can withstand the instant Motion to Dismiss.

**E.    Conversion**

BIC again argues that a conflict exists between New Jersey and Virginia conversion laws because of the shorter statute of limitations in Virginia, five-years, versus the six-year limitation in New Jersey.  Va. Code § 8.01-243(B); N.J.S.A. § 2A:14-1.  However, Arcand's

claim is well-within both statutes of limitation, and as already discussed above, no actual conflict exists. The Court finds because no conflict exists between New Jersey and Virginia conversion laws, New Jersey law applies. Conversion in New Jersey is defined as: "'some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel.'" Potash Stores, Inc. v. Bay Dev. Corp., 118 N.J.L. 242, 244 (N.J. 1937) (quoting Woodside v. Adams, 40 N.J.L. 417, 431 (N.J. 1878). "The theory behind conversion is that the actor has exerted such a major and serious interference with the plaintiff's rights to the chattel that in essence the law will force a judicial sale of the chattel upon the defendant." LaPlace v. Briere, 404 N.J.Super. 585, 596 (App. Div. 2009).

BIC contends that an indispensable element of a conversion claim is the exertion of physical interference with the plaintiff's rights to chattel. Without allegations that BIC took physical possession of the toner, BIC argues that a claim for conversion cannot stand. Nothing in the case law or Restatement (Second), however, supports such a limited reading of conversion claims. What matters is the substantial impact the actor's interference has on the plaintiff's rights in his chattel, regardless of whether that impact is caused by the actor taking physical possession, or as alleged here, the use of an automated system that acts to fundamentally change the nature of the plaintiff's personal property. Indeed, the Appellate Division recently reiterated that conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another." LaPlace, 404 N.J. Super. at 485. Here, BIC allegedly programmed its printers to cease printing while usable toner remained, an action that could be construed as interfering with Plaintiffs' use of the toner.

42

To the extent Plaintiffs allege that BIC's hard stop printing mechanism constitutes a trespass, the Court finds that it is not inconsistent with Plaintiffs' rights of ownership over the toner cartridges and the printer for BIC to preclude its customers from using the very last drop of ink in a printer cartridge where users were informed that the cartridge's lifespan is tied to a maximum number of pages.  Unless Plaintiffs printed materially less pages than originally promised, their rights over the chattel extinguished when they received the number of pages advertised and included in the user manual.[14]  This Court has to conclude, therefore, that because Plaintiffs' interest in the toner was necessarily tied to the number of pages it could print, Plaintiffs cannot sustain a cause of action for conversion for the alleged actions taken by BIC after that page limit was reached.

## F.      Trespass to Chattels

Similar to its previous argument against the application of New Jersey law over Plaintiffs' claims for conversion, BIC advances that a conflict of law exists between New Jersey and Virginia's treatment of trespass to chattel claims - that the five-year statute of limitations in Virginia creates a conflict with New Jersey's six-year statute of limitations. As this Court has already found, this does not create a conflict for Arcand's claim and, therefore, New Jersey law applies.

New Jersey has long recognized, albeit infrequently, the tort of trespass to chattels. See, e.g., Mueller v. Tecnical Devices Corp., 8 N.J. 201 (1952) (citing Frome v. Dennis, 45 N.J.L. 515 (N.J. 1883)). A cognizable claim for trespass occurs "when personal property, in the actual use of the owner, is injured or taken by a trespasser, so that the owner is

---

[14]      This is not to say that conversion could not be found in instances where a printer is programmed to cease printing before the advertised lifespan of the cartridge such that the user receives materially less than the number of pages indicated.

deprived of the use of it." Luse v. Jones, 39 N.J.L 707 (N.J. 1877). Admittedly, the case

law in this area is sparse; thus, the Court turns to the Restatement (Second) of Torts 217

for more guidance: "a trespass to a chattel may be committed by intentionally . . .

intermeddling with a chattel in the possession of another." Importantly, physical contact

with the chattel, for instance, where a person kicks another's car bumper, is not required.

All that is required under the Restatement (Second) is interference with the chattel as a

direct or indirect result of an act done by the actor. BIC does not contest this general

proposition and instead advances the same argument that prevailed before the court in

Kandel v. Brother International Corp., that BIC has done nothing after the sale of the

printers or toner cartridges to effect a trespass. More specifically, the Kandel court

rejected the consumer's trespass to chattels claim on two grounds: (1) that BIC took no

action after the consumer took possession; and (2) the consumer never had possession of

the functionality that he alleged he was entitled to. Kandel v. Brother International

Corp., No. 08-1040 (DSF) (consolidated with 08-6126 (DSF)), 2009 U.S. Dist. LEXIS 12881,

at *4-5 (C.D. Cal. Feb. 13, 2009). Additionally, the Kandel court posited that the

consumer's claim should be adjudicated under fraud and false advertising claims, and not

in trespass or conversion. Id.

    Plaintiffs adamantly reject Kandel in its entirety, instead directing this Court's

attention to Baggett. See Baggett, 582 F. Supp. 2d at 1270. In Baggett, the defendant

advanced a narrow and unsuccessful challenge to the plaintiff's trespass to chattels claim,

specifically that a physical, and not an electronic, interference is required to sustain a

claim for trespass. In finding that California law embraces trespass to chattels claims

where the trespass was accomplished by an automated system, the Baggett court stated

that because "HP allegedly programmed the printer to stop printing when the ink cartridges were not empty. . .[they] deprive[d] Plaintiff of his remaining ink". Id.

While not in complete agreement with Kandel, particularly that BIC did not take some action after the consumer started using the printer and the cartridges,[15] nevertheless, the Court finds that Plaintiffs' trespass to chattels claim fails.  In no way, as previously stated, can Plaintiffs retain any more functionality in the cartridge than explicitly promised in the user manual.  Because Plaintiffs have not alleged that the shutdown mechanism precluded them from receiving the maximum number of pages the cartridge could print, Plaintiffs cannot sustain a claim that BIC improperly interfered with the cartridge's expected functionality.    Indeed, besides Baggett, Plaintiffs fail to provide any other authority that endorses such a theory of recovery.  A survey of the relevant case law in New Jersey only confirms this point.  In Luse, for instance, the plaintiff properly stated a claim for trespass to chattels where the defendants "wrongfully entered her house, removed her furniture and sold it, and thus interfered with her business."  39 N.J.L. at * 2.  Similarly, in Post v. Munn, 4 N.J.L. 61 (N.J. 1818), the court found that the defendant's negligent destruction of the plaintiff's fishing net while navigating the Passaic River was actionable as a trespass to chattels claim. What the case law suggests is that an actionable trespass is one where the owner was temporarily deprived of an undisputed right in his property.  Accordingly, Plaintiffs' trespass to chattels claim cannot withstand the instant

---

[15]A party may, as noted in the Restatements (Second) of Torts 221, affect a trespass to chattels by fraud.  See A.J. Cunningham Packing Corp. v. Congress Financial Corp., 792 F.2d 330, 334 n.4 (3d Cir. 1986). Generally, the fraud would be a misrepresentation to induce another to voluntarily dispossess himself of a chattel, i.e. a mechanic falsely informing someone that their car should be junked when in fact it is entirely usable in an effort to take the car for himself.  Essentially, that is the allegation the Court has here: informing the consumer the cartridge is empty and unusable when that is not the case.

Motion to Dismiss.

### G. BIC's Motion to Dismiss Nationwide Class Allegations

Finally, BIC seeks the dismissal of Plaintiffs' nationwide class allegations. However, because this Court has dismissed Plaintiffs' Complaint in its entirety, BIC's motion is moot.

### III. Conclusion

For the foregoing reasons, BIC's Motion to Dismiss is granted.  Plaintiffs' trespass to chattels and conversion claims are dismissed with prejudice.  Plaintiffs' NJCFA and fraudulent concealment claims are dismissed without prejudice.  Plaintiffs shall have twenty days to amend their Complaint in accordance with this Court's Opinion and Order.

Dated: November 30, 2009                                  /s/ Freda L. Wolfson
                                                          **United States District Judge**